**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | | |
|---|---|---|
| **SIGMA LAMBDA UPSILON/** | ) | |
| **SEÑORITAS LATINAS UNIDAS** | ) | |
| **SORORITY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 3:18-cv-00085-GEC** |
| | ) | |
| **RECTOR AND VISITORS OF THE** | ) | |
| **UNIVERSITY OF VIRGINIA, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Rector and Visitors of the University of Virginia ("UVA"), Frank M. Conner III, Patricia Lampkin, J. Marshall Pattie, Edgar Halcott Turner II, and Caroline Wagner (née Ott)[1] (collectively, "Defendants"), by counsel, submit this memorandum in support of their Motion to Dismiss and in response to the Second Amended Complaint ("SAC") filed by plaintiff Sigma Lambda Upsilon/Señoritas Latinas Unidas Sorority, Inc. ("SLU").

The Court should dismiss the SAC because the individual defendants are entitled to Eleventh Amendment immunity in their official capacities and qualified immunity in their personal capacities and because the SAC fails to state a claim for any violation of the First or Fourteenth Amendments, 42 U.S.C. §§ 1983, 1985(3), or 1986, or 20 U.S.C. § 1681.

---

[1] The Motion to Dismiss is not filed on behalf of the defendants identified only as John and Jane Does 1-10, who are allegedly "officers of UVA who have directly participated in the infringement of SLU's rights." SAC ¶ 12. But because the SAC's allegations state that all individual defendants except Conner are "jointly and severally" responsible for the hazing investigation and finding against SLU, *see* SAC ¶¶ 22, 34, the named defendants' arguments apply with equal force to the Doe defendants, who are also entitled to dismissal from this action.

# I.      PROCEDURAL BACKGROUND

SLU originally filed a Complaint against UVA only, and UVA responded with a Motion to Dismiss. *See* ECF Nos. 1, 5. SLU moved to amend the Complaint, and the Court permitted amendment under Rule 15(a)(1)(B). *See* ECF Nos. 7, 8. SLU's First Amended Complaint added five named individual defendants, ten Doe defendants, and three new counts. *See* ECF No. 9. The Court set the case for a jury trial on January 29-31, 2020. *See* ECF No. 12. UVA and the five named individual defendants filed Answers and Affirmative Defenses. *See* ECF Nos. 10, 16-20.

The parties engaged in discovery and filed various discovery motions. *See* ECF Nos. 25, 27, 30. The Court conducted a hearing and, in light of the parties' representations that the nature of their dispute had changed, entered an Order taking the discovery motions under advisement and directing SLU to file an amended complaint and the defendants to file responsive pleadings. *See* ECF No. 34. SLU filed a Second Amended Complaint. *See* ECF No. 36. The SAC, while largely unchanged from the First Amended Complaint, acknowledges UVA's reinstatement of SLU but claims that Defendants continue to prohibit SLU from imposing on its members a 25 hour per week study requirement, *see* SAC ¶¶ 61-65, and adds a comparison of SLU's hazing to physical injuries allegedly suffered by members of the UVA football team, *see* SAC ¶¶ 50-59.

# II.     FACTUAL ALLEGATIONS

## A.      Defendants' Hazing Finding, Suspension, and Reinstatement of SLU

As pleaded in the SAC, SLU is a private, historically Latina sorority with a chapter at UVA. *See* SAC ¶ 5. SLU brings this action against UVA, five named individual defendants who are or were UVA officers or employees, and ten unnamed officers of UVA alleged to have participated in the infringement of SLU's rights. *See* SAC ¶¶ 6-11. It asserts four counts against the individual defendants: First Amendment free speech and association and Fourteenth Amendment sex-based equal protection violations under 42 U.S.C. § 1983, a conspiracy claim

under 42 U.S.C. § 1985(3), and a neglect claim under 42 U.S.C. § 1986. *See* SAC ¶¶ 72-92. It asserts one count against UVA: alleged disparate treatment discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"). *See* SAC ¶¶ 93-96.

This action arises from UVA's hazing investigation of SLU during the spring 2018 semester. *See* SAC ¶ 22. In early 2018, SLU "was operating on UVA's Charlottesville campus"[2] by recruiting students to become new members of SLU. SAC ¶ 13. SLU requires its new members to adhere to its internal policies, which include a requirement that its members "study for academic courses for at least 25 hours per week," ostensibly related to its goal of developing academically successful members to be public and private leaders. SAC ¶ 17. *See* SAC ¶¶ 16, 21. In February 2018, a new member of SLU reported to UVA that she was struggling with "the burdens of being a new UVA student and pledging for a sorority," though she denied being hazed or mistreated by SLU. SAC ¶ 23. *See* SAC ¶¶ 24-25. Based on this report, Defendants (except Conner) began a formal hazing investigation of SLU on February 14, 2018. *See* SAC ¶¶ 22, 26. They interviewed other SLU members, who also denied that any hazing had occurred, and they collected and reviewed SLU documents. *See* SAC ¶¶ 27, 30-31.

On March 1, 2018, Defendants (except Conner) issued an Outcome Letter finding SLU responsible for violating UVA's Hazing Policy. *See* SAC ¶¶ 33, 39, 67. SLU contends that this finding was based on no evidence and that the sole basis for the hazing finding was SLU's 25 hour per week study requirement.[3] *See* SAC ¶¶ 35, 38-40, 50-53; *see also id.* ¶ intro. (mentioning SLU's "supplemental enrichment" programs as another hazing concern). Further, SLU avers that

---

[2]      UVA "occupies the portion of Charlottesville known, not as the 'campus,' but as 'the grounds.'" *United States v. Virginia*, 518 U.S. 515, 584 n.4 (1996) (Scalia, J., dissenting).

[3]      The Outcome Letter referenced by SLU belies these allegations. *See* Exhibit B, Outcome Letter at 1-2 (listing the actions and situations that form the basis for the hazing finding).

UVA has "no actual policy that reasonably defines hazing"[4] and did not inform fraternal organizations "of a general prohibition against studying 25 hours per week." SAC ¶¶ 48-49. As a result of the hazing finding, Defendants suspended SLU from operating on grounds. *See* SAC ¶ 59. Defendants later allowed SLU to resume its activities on grounds, "but only on the condition that [SLU] agree to to [sic] eliminating the 25 hour per week study requirement,"[5] which SLU agreed to "under duress and solely to lift the suspension." SAC ¶¶ 61-62.

Accordingly, the SAC seeks the following relief: (1) a declaration that the individual defendants violated SLU's First and Fourteenth Amendment rights by suspending SLU from operating on UVA grounds from February 2018 to February 2019; (2) a declaration that only UVA continues to violate SLU's First Amendment rights by conditioning SLU's reinstatement on eliminating its policy of requiring its members to study 25 hours per week; (3) a declaration that UVA's (purportedly nonexistent) hazing policy violates Title IX; (4) a permanent injunction prohibiting Defendants from suspending SLU or infringing its civil rights in the future; (5) unspecified money damages; and (6) attorney's fees and costs. *See* SAC ¶¶ (A)-(F).

### B.   Allegations Related to First Amendment Claim

SLU claims that the individual defendants have violated its rights to free speech and free association under the First Amendment by suspending its fraternal activities on grounds from February 2018 to February 2019. *See* SAC ¶¶ intro., 59, 72-77. In support of this claim, it alleges that it engaged in expressive free speech by recruiting UVA students to become new members.

---

[4]   UVA's Hazing Policy is, and at all relevant times has been, available on its public website. *See* Univ. of Va., Record Policy 2017-2018, https://hazing.virginia.edu/what-hazing.

[5]   These allegations contradict the plain language of SLU's Articles of New Member Education Program ("NMEP"), as approved by UVA in February 2019 to end the suspension: "The Sorority will not require a Dama to devote more than 15 hours per week for sorority activities and project time. This 15 hour limitation does not include the 25 hours per week for academic study time that the Sorority recommends to its Damas." Ex. C, NMEP ¶ 10.

*See* SAC ¶¶ 13-14. SLU's "core associative goals and beliefs" include its policy of requiring its members to "study for academic courses for at least 25 hours per week," its practices of taking new members on a surprise trip to meet SLU leadership in New York and requiring new members to learn about SLU's history and mission, and its goal of "develop[ing] academically successful members who will develop into public and private leaders." SAC ¶¶ 16-21.

In addition, SLU claims that the individual defendants continued to infringe its First Amendment rights after permitting it to resume its activities on grounds in February 2019 because they conditioned the reinstatement on "a duress induced agreement to limit the free exercise of the core practice of 25 hours per week study." SAC ¶ 75. *See* SAC ¶¶ 61-63.

### C.   Allegations Related to Fourteenth Amendment and Title IX Claims

SLU claims that the individual defendants have violated its right to equal protection under the Fourteenth Amendment on the basis of sex by suspending it "and not other similarly-situated fraternal and male exclusive organizations." SAC ¶ 75. *See* SAC ¶¶ 78-82. Similarly, it asserts that UVA has engaged in sex-based disparate treatment discrimination in violation of Title IX because the Hazing Policy allegedly "applies only to women but not to men, regardless of whether those men make millions of dollars for UVA through sports or not." SAC ¶ 94. *See* SAC ¶¶ 93-96. In support of these claims, SLU compares itself to other UVA activities, student groups, and men's sports teams that allegedly "require 'activity' programming in excess of 25 hours per week," or that allegedly have been permitted "to continue operating even when more serious (i.e. actual) hazing incidents occurred." SAC ¶ 42, 68. *See* SAC ¶¶ 43, 66, 69, 80.

SLU's first comparator is UVA's men's sports teams, which it claims are subject to National Collegiate Athletic Association ("NCAA") rules that limit "countable athletically related activity" to 20 hours per week but place no limit on additional activities including "study hall, tutoring, or academic meetings." SAC ¶ 45. As its only example, SLU singles out the UVA

men's basketball team, which participated in the "Battle 4 Atlantis" tournament in November 2018. *See* SAC ¶ 46. SLU claims that the team's student-athletes engaged in more than 23 hours of sports activity within a week, including 12-20 hours of travel and 6 hours of games, but that the team was not investigated or disciplined for hazing. *Id.* in addition, SLU alleges that unspecified men's sports teams were not suspended for unspecified but "more serious" hazing incidents. SAC ¶ 69. Perhaps relatedly, SLU asserts that UVA football team members routinely suffer serious injuries during practices and games that do not result in a hazing finding against the football team. *See* SAC ¶¶ 55-58.

SLU's second comparator is UVA's academic programs and courses, some of which "require more than 25 hours of study per week" but are not considered hazing. SAC ¶ 47. SLU's third and final comparator is "non-female fraternal organizations," which it also claims were not suspended for unspecified, allegedly "more serious" hazing incidents. SAC ¶ 68.

## III.   LEGAL STANDARD

### A.   Rule 12(b)(1)

A motion to dismiss under Rule 12(b)(1) tests a court's subject matter jurisdiction over a plaintiff's claims. The plaintiff bears "the burden of proving that subject matter jurisdiction exists." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (citations omitted). In deciding a Rule 12(b)(1) motion, "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* (citations omitted). The court must, however, "view[] the alleged facts in the light most favorable to the plaintiff, similar to an evaluation pursuant to Rule 12(b)(6)." *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999) (citations omitted). Dismissal under Rule 12(b)(1) is proper "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans*, 166 F.3d at 647 (citations omitted).

### B.      Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has stated a claim. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). A plaintiff is required to state facts sufficient to "raise a right to relief above the speculative level," alleging a claim that is plausible rather than merely "conceivable." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (citations omitted). To determine whether the plaintiff has met this plausibility standard, the court must take as true all well-pleaded facts and must "draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards*, 178 F.3d at 244 (citations omitted), but it need not accept "unwarranted inferences, unreasonable conclusions, or arguments" or legal conclusions couched as facts. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (citations omitted).

The court may also consider "documents central to [a] plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed." *Baker v. McCall*, 842 F. Supp. 2d 938, 943 (W.D. Va. 2012) (citing *Witthohn v. Fed. Ins. Co.,* 164 F. App'x 395, 396 (4th Cir. 2006)). Accordingly, Defendants request that the Court consider the following documents that SLU refers to in the SAC and/or that are central to its claims: (1) UVA's Hazing Policy, as in effect during the 2017-2018 school year, attached as Exhibit A; (2) UVA's March 1, 2018 Outcome Letter to SLU (redacted under Consent Order ¶ 6, ECF No. 24), attached as Exhibit B; and (3) SLU's Articles of the New Member Education Program ("NMEP") approved by UVA in February 2019, ending SLU's suspension, attached as Exhibit C. *See* SAC ¶¶ 33, 61, 94. The authenticity of these documents is not in dispute, and the Court may consider them without treating this as a summary judgment motion under Rule 12(d).

IV.    ARGUMENT

A.    This Court Lacks Subject Matter Jurisdiction.

As an initial matter, the SAC is silent about whether SLU asserts its claims against the individual defendants in their official or personal capacities. "When a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity." *DePaola v. Clarke*, 394 F. Supp. 3d 573, 595-96 (W.D. Va. 2019) (citing *Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir. 1995)). Construed liberally, the SAC seeks relief against the individual defendants in both capacities. It seeks unspecified monetary damages that it could only recover against the individual defendants in their personal capacities, *see* SAC ¶ E, but it also seeks a permanent injunction to prevent these defendants from taking any future actions that infringe SLU's rights, *see* SAC ¶ D, which could only implicate their official roles. As shown below, any official capacity claims fail because the individual defendants are entitled to Eleventh Amendment immunity, any personal capacity claims fail because these defendants are entitled to qualified immunity, and the claims against these defendants also fail because the SAC states no claim for any violation of the United States Constitution or federal law.

1.    Eleventh Amendment immunity bars SLU's official capacity claims against the individual defendants.

The Court should dismiss SLU's § 1983 official capacity claims against the individual defendants under Rule 12(b)(1) because these defendants are state officials entitled to Eleventh Amendment immunity.[6]   The Eleventh Amendment provides that "[t]he judicial power of the

---

[6]     Though "not a true limit on the subject-matter jurisdiction of federal courts, the Eleventh Amendment is a block on the exercise of that jurisdiction." *Roach v. W. Va. Reg'l Jail & Corr. Facility Auth.*, 74 F.3d 46, 48 (4th Cir. 1996) (citations omitted). District courts in the Fourth Circuit often consider Eleventh Amendment immunity under Rule 12(b)(1). *See, e.g.*, *Briggman v. Commonwealth*, 526 F. Supp. 2d 590, 601-02 (W.D. Va. 2007).

United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state . . . ." U.S. Const. amend. XI. The Eleventh Amendment precludes actions by private parties in federal courts against states, their agencies, and their officials. *See Edelman v. Jordan,* 415 U.S. 651, 663 (1974) (citations omitted); *Bockes v. Fields*, 999 F.2d 788, 790 (4th Cir. 1993) (citations omitted).

While "state officials literally are persons," an official-capacity claim "is not a suit against the official but rather is a suit against the official's office."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citations omitted). Thus, an official capacity claim "is no different from a suit against the State itself." *Id.* (citations omitted). Accordingly, SLU's official capacity claims against the individual defendants are in effect claims against UVA, which SLU does not dispute is "an agency of the Commonwealth of Virginia." SAC ¶ 6.

The University of Virginia is a state institution governed by a corporate board, the Rector and Visitors of the University of Virginia, which is controlled by the Virginia General Assembly. *See* Va. Code Ann. § 23.1-2200. UVA is the real party in interest for official capacity claims, and its officers and employees are state officials protected by the Eleventh Amendment. *See Wilson v. Univ. of Va.*, 663 F. Supp. 1089, 1092 (W.D. Va. 1987) ("It cannot be disputed that the University of Virginia is an arm of the state entitled to eleventh amendment protection," and "the eleventh amendment bars suits against state officers and employees in their official capacities.") (citations omitted). Because Eleventh Amendment immunity bars any official capacity claims against the individual defendants, these claims should be dismissed with prejudice.

Further, the *Ex parte Young* exception to Eleventh Amendment immunity has no application here. Under this exception, "federal courts may exercise jurisdiction over claims against state officials by persons at risk of or suffering from violations by those officials of

federally protected rights, if (1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective." *Republic of Paraguay v. Allen*, 134 F.3d 622, 627 (4th Cir. 1998) (citing *Ex parte Young*, 209 U.S. 123, (1908); other citations omitted). *Ex parte Young* "applies only to claims against state officials," and "has no application in suits against the States and their agencies, which are barred regardless of the relief sought." *Caperton v. Va. DOT*, No. 3:15-cv-36, 2015 U.S. Dist. LEXIS 145926, at *9 (W.D. Va. Oct. 28, 2015) (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)). To bypass Eleventh Amendment immunity, SLU attempts to plead a continuing violation of its First Amendment rights to free speech and free association. *See* SAC ¶¶ 60-62, 75. The relief that SLU seeks for this alleged ongoing violation, however, is only against UVA: it asks the Court to "[d]eclare UVA's insistence on a less than 25 hour per week study group policy violates the First Amendment." SAC ¶ B. This relief is barred by UVA's absolute Eleventh Amendment immunity as an agency of the Commonwealth, which is not subject to the *Ex parte Young* exception.

> **B.** **The Second Amended Complaint Fails to State Any Claim Upon Which Relief Can Be Granted Under Virginia Law.**

The Court should dismiss all remaining claims under Rule 12(b)(6) because SLU has failed to state a claim against the individual defendants in their official or personal capacities for a violation of the First Amendment, Fourteenth Amendment, or of § 1983, § 1985(3), or § 1986, the individual defendants are entitled to qualified immunity for any personal capacity claims under § 1983, and SLU has failed to state a claim against UVA for violating Title IX.

> **1.** **The individual defendants in their official capacities are not persons against whom a § 1983 claim can be asserted.**

The individual defendants in their official capacities are not persons under § 1983. Section 1983, by its express language, applies only to claims against a person:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

The U.S. Supreme Court has recognized that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will*, 491 U.S. at 71. Any official capacity claims by SLU are not claims against the individual defendants themselves, but instead are claims against their public office, UVA, a Commonwealth agency. These claims should be dismissed because they do not name a person against whom SLU may assert § 1983 claims.

### 2. The SAC alleges no personal involvement by Conner.

The SAC separates the individual defendants into two groups: Conner and everyone else. All individual defendants except Conner are alleged to have acted "jointly and severally" in investigating SLU and making the hazing finding against it. *See* SAC ¶¶ 22, 34. Conner, in his role as UVA's Rector, was allegedly "responsible for the University's administration and policy making and ha[d] ultimate authority to approve the policies and practices" challenged by SLU— i.e., UVA's Hazing Policy. *See* SAC ¶ 7. SLU concedes that Conner did not participate in UVA's hazing investigation or make the hazing finding against SLU. *See* SAC ¶¶ 22, 34. Rather, SLU asserts only that Conner "is aware of and has approved the other Defendants' actions, and has taken no steps to remediate the ongoing violation of SLU's rights." *See* SAC ¶ 70.

SLU's claims against Conner fail because SLU does not plead that Conner had any personal involvement in any alleged violation of its constitutional rights. "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "In order for an individual to be liable under § 1983, it must

be affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." *Stultz v. Virginia*, 203 F. Supp. 3d 711, 731 (W.D. Va. 2016) (quoting *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985)). "The doctrine of respondeat superior has no application under this section." *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)). The SAC pleads that Conner played no role in conducting the hazing investigation or making the hazing finding against SLU. *See* SAC ¶¶ 22, 34. Accordingly, SLU has alleged no personal involvement by Conner in any claimed constitutional violation, and the Court should dismiss Conner from this action.

### 3. The SAC fails to state a claim under § 1983.

"Section 1983 itself creates no rights; rather it provides a method for vindicating federal rights elsewhere conferred." *Kendall v. City of Chesapeake*, 174 F.3d 437, 440 (4th Cir. 1999) (citing *Albright v. Oliver*, 510 U.S. 266, 271 (1994)). Thus, "to state a claim under § 1983, a plaintiff must allege the violation of a right preserved by another federal law or by the Constitution." *Id.* (citing *Baker v. McCollan*, 443 U.S. 137, 140, 144 n.3 (1979)). The SAC fails to state a claim for a violation of the First or Fourteenth Amendments, or any other federal civil right, and thus fails to state a § 1983 claims against the individual defendants in any capacity.

#### i. The SAC fails to state a claim under the First Amendment for a free speech or free association violation.

Under the First Amendment, "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const., amend. I. *See Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943) (recognizing that the Fourteenth Amendment makes the First Amendment applicable to the states). Free speech includes the freedom to associate. *See NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460-61 (1958) (citations omitted).

The U.S. Supreme Court's decision in *Christian Legal Society Chapter of the University of California v. Martinez*, 561 U.S. 661 (2010), defines the contours of student organizations' First Amendment speech and associational rights at public educational institutions. In *Martinez*, the University of California Hastings College of Law ("Hastings") operated a Registered Student Organization ("RSO") program that permitted student groups to apply for official recognition and other benefits in exchange for agreeing to abide by Hastings' Policies and Regulations Applying to College Activities, Organizations, and Students. *Id.* at 669-70. These policies included a Nondiscrimination Policy requiring RSO groups to allow any student to be a member or officer. *Id.* at 670-71. The Christian Legal Society ("CLS") was a private organization that required each of its law school chapters to adopt bylaws prohibiting membership by students with inconsistent religious convictions. *Id.* at 672. Hastings rejected CLS's application for RSO status because this membership limitation did not comply with the Nondiscrimination Policy, but notified CLS that it was free to operate outside of the RSO program and forgo its benefits. *Id.* at 673. CLS sued under § 1983, alleging that Hastings had violated its First Amendment rights to, inter alia, free speech and expressive association. *Id.* The Court rejected these claims after finding that the Nondiscrimination Policy was reasonable and viewpoint neutral. *Id.* at 697.

The *Martinez* Court recognized that public educational institutions such as Hastings may constitutionally establish a limited public forum, limit the use of that forum to only certain groups, and impose restrictions on speech that are reasonable and viewpoint neutral. *Id.* at 679 (citations omitted). It concluded that its "limited-public-forum precedents supply the appropriate framework for assessing both CLS's speech and associational rights." *Id.* at 680. The Court also explained that, because educational institutions' "mission is education," they have the "authority to impose reasonable regulations compatible with that mission" on the use of their property and

facilities, and they may "require that a group seeking official recognition affirm in advance its willingness to adhere to . . . reasonable standards respecting conduct." *Id.* at 683-84 (citations omitted). Accordingly, because First Amendment rights "must be analyzed in light of the special characteristics of the school environment," courts should "resist substituting their own notions of sound educational policy for those of the school authorities which they review." *Id.* at 685-86 (citations omitted).

Applying this framework, the Court first examined whether the Nondiscrimination Policy was reasonable in light of the purpose of the RSO limited public forum. *Id.* at 687-90. It found that Hastings' justifications for the policy, such as opening the leadership, educational, and social opportunities of RSOs to all students, were reasonable. *Id.* The Court next looked to whether the policy was viewpoint neutral, noting that "a regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* at 695 (citations omitted). It found that the policy was "justified without reference to the content or viewpoint of the regulated speech" because it sought to prevent certain conduct—exclusionary membership practices—without reference to the reasons motivating such conduct. *Id.* at 696 (citations omitted). The Court also found it significant that private fraternal groups and other student organizations "commonly maintain a presence at universities without official school affiliation," and "when access barriers are viewpoint neutral, . . . other available avenues for the group to exercise its First Amendment rights lessen the burden created by those barriers." *Id.* at 690-91 (citations omitted).

The SAC fails to state a claim for violation of SLU's First Amendment rights to free speech or expressive association under the *Martinez* framework. *See* SAC ¶¶ 72-77. Like CLS, SLU is a private corporation seeking the benefits of official recognition as a student organization

at UVA, including the privilege to conduct its activities on UVA's grounds. *See* SAC ¶¶ 5, 13, 61. Like Hastings, UVA requires student organizations to abide by its University Policies and Standards of Conduct, including the Hazing Policy. *See* Ex. A. The SAC pleads that UVA suspended its recognition of SLU as a student organization after finding that SLU's new member education program violated the Hazing Policy. *See* SAC ¶¶ 33, 39, 67; Ex. B. SLU claims that while it was suspended, its members could not engage in the expressive activities of new member recruitment, enforcing mandatory study hours, requiring new members to learn about SLU, or planning a trip to New York to meet SLU leadership. *See* SAC ¶¶ 13-21. It also claims that the First Amendment violations continued after UVA reinstated SLU because SLU was not free to enforce its policy requiring its members to study for 25 hours per week. *See* SAC ¶¶ 61-63, 75. SLU does not claim that Defendants prohibited any of its members from studying 25 hours per week, but rather that UVA would not permit it to mandate their actions in this way.

UVA's property and facilities are a limited public forum, and UVA may limit the use of this forum to only certain groups and may impose restrictions on speech that are reasonable and viewpoint neutral. UVA's Hazing Policy meets both criteria. First, it is reasonable in light of the purpose of UVA's recognition of student organizations on grounds: it exists to protect students who are members or prospective members of student organizations from actions and situations that may cause harm. *See* Ex. A at 1. Second, the Hazing Policy is viewpoint neutral because it regulates conduct rather than speech and does not inquire into the reasons motivating the conduct. *See id.* (prohibiting any "action taken" or "situation created" by members of student organizations toward members or prospective members that "[i]s designed to produce or does produce mental or physical harassment, humiliation, fatigue, degradation, ridicule, shock, or injury"). As such, any effect that SLU's suspension for violating the Hazing Policy may have

had on its First Amendment rights was incidental and is not actionable. Moreover, SLU as a private organization was and is free to maintain a Charlottesville-area chapter with a mandatory study-hour policy if it operates without seeking recognition from UVA as a student organization and forgoes the corresponding benefits and obligations of that status. The Court should dismiss SLU's First Amendment claims because these claims are facially deficient under *Martinez*.

The SAC attempts to allege a continuing violation by asserting that Defendants conditioned SLU's reinstatement as a student organization on the elimination of its "core practice" of requiring its members to study 25 hours per week. *See* SAC ¶¶ 17, 61, 75, (B). Because SLU seeks UVA's recognition as a student organization, it is bound by UVA's Hazing Policy, and Defendants have allegedly found that the 25 hour per week study requirement violates that policy. *See* SAC ¶¶ 39-40. The Hazing Policy does not regulate the speech that studying is a core SLU value, but rather the conduct of SLU student members forcing other students to engage in a particular activity for 25 hours per week. Thus, the SAC's factual allegations are insufficient to state a claim for a continuing First Amendment violation.

In addition, the revised Articles of New Member Education Program agreed to by counsel for SLU and UVA in February 2019 states: "The Sorority will not require a Dama to devote more than 15 hours per week for sorority activities and project time. This 15 hour limitation does not include the 25 hours per week for academic study time that the Sorority recommends to its Damas." Ex. C, NMEP ¶ 10. Defendants disagree that permitting SLU to *recommend* 25 hours per week is tantamount to *eliminating* SLU's study requirement or infringing its rights. SLU is free to recommend to its members that they study for 25 hours per week, and its members are free to do so; Defendants have placed no limitation on SLU members' ability to associate in this way. Moreover, SLU as a private organization is free to either forgo recognition by UVA and

retain its absolute study requirement or to participate in UVA's limited public forum subject to the reasonable and viewpoint neutral conduct limitations imposed by the Hazing Policy.

### ii. The SAC fails to state a claim under the Fourteenth Amendment for an equal protection violation.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV. This clause "guarantees equal laws, not equal results." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979). In the context of a sex-based discrimination claim, government action that burdens one sex more than another does not violate the Equal Protection Clause absent a showing of intentional or purposeful discrimination. *Id.* at 274. Accordingly, "[t]o succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). The SAC fails to adequately allege either element.

The similarly situated standard "requires a plaintiff to identify persons materially identical to him or her who has received different treatment." *Kolbe v. Hogan*, 813 F.3d 160, 185 (4th Cir. 2016). Regardless of how "the test is written, the basic point is the same: the evidence must show an extremely high degree of similarity." *Id.* (citations omitted). In the student discipline context, "[f]or their circumstances to be considered sufficiently similar, two individuals must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the school's treatment of them for it." *Doe v. Fairfax Cty. Sch. Bd.*, No. 1:19-cv-65, 2019 U.S. Dist. LEXIS 170577, at *11 (E.D. Va. Sep. 11, 2019) (examining male and female students' specific conduct, after finding that mere

application of the same sexual harassment policy was an insufficient connection to establish similarity) (citations omitted). The comparators in the SAC are not sufficiently similar to SLU.

The SAC alleges that the individual defendants violated SLU's equal protection rights "[b]y suspending SLU and not other similarly-situated and male exclusive organizations" for violating the Hazing Policy. SAC ¶ 80. The Hazing Policy applies to "members of a student organization" and their interactions with members or prospective members of the organization. *See* Ex. A at 1. It does not extend to other interactions, such as UVA's interactions with its students or the NCAA's interactions with student-athletes. SLU seeks to draw comparisons with UVA academics, men's sports teams, and male fraternities, but each fails for lack of similarity.

SLU's first comparator is "certain courses and academic programs offered at UVA [that] require more than 25 hours of study per week" for satisfactory completion. SAC ¶ 47. This comparison fails because it alleges no sex-based discrimination, UVA is not a member of a student organization to which the Hazing Policy would apply, and students' voluntary choice to study for 25 hours per week for a particular course or major is not the same conduct as SLU's imposition of a requirement that its members must study for 25 hours per week.

SLU next turns to "non-female fraternal organizations" and "male sports organizations," alleging that Defendants have allowed these groups "to continue operating even when more serious (i.e. actual) hazing incidents occurred." SAC ¶¶ 68, 69. The SAC, however, rests on this conclusory statement and provides no further facts about the allegedly more serious incidents. Thus, it is not possible to conclude that either group is similarly situated to SLU under the facts here, which are insufficient to show whether any "materially identical" male student organization with "an extremely high degree of similarity" engaged in the "same conduct" as SLU but that this conduct was intentionally ignored by the individual defendants.

The SAC also alleges that "male students in programs or groups," including "NCAA scholarship athletes," have "similar or greater study hour requirements" than SLU. SAC ¶ 43. In support of this claim, SLU points to NCAA rules that limit "athletically related activity" but do not limit "study hall, tutoring, or academic meetings." SAC ¶¶ 44. This comparison fails because the NCAA is not a member of a student organization to which the Hazing Policy applies, and a policy permitting studying is not the same conduct as a policy requiring a mandatory amount of study hours. SLU also offers the example of the UVA men's basketball team, which allegedly engaged in sports-related activity for more than 23 hours in a single week when it participated in the Battle 4 Atlantis tournament in November 2018. *See* SAC ¶ 46. The Hazing Policy is not implicated: the men's basketball team is a UVA department, not a student organization; a basketball tournament is a school activity rather than an action or situation imposed by players on other teammates; and the conduct at issue—traveling for basketball games and playing basketball—is not the same conduct for which SLU was disciplined.

SLU further claims that UVA "routinely allows students to associate in a number of activities that cause substantial physical, mental, and emotional harm" without making a hazing finding against these students' organizations. SAC ¶ 54. As an example, the SAC cites the UVA football team, whose players have allegedly suffered injuries while playing or practicing football. *See* SAC ¶¶ 55-58. Again, the Hazing Policy has no application: the football team is a UVA department, not a student organization; football practices and games are school activities rather than actions or situations imposed by players on other teammates; and the conduct at issue— practicing and playing football—is not the same conduct for which SLU was disciplined.

Notably, the SAC is devoid of any claim that members of a male student organization engaged in the same conduct by requiring other members or potential members to study for a

19

comparable or greater number of hours per week, and that the individual defendants allowed the male student organizations to continue to impose this study requirement while disciplining SLU. Without such a similarly situated comparator, SLU fails to state an equal protection claim.

An equal protection plaintiff must also plead sufficient facts to show that the allegedly unequal treatment "was the result of *intentional or purposeful discrimination*." *Equity in Ath., Inc. v. Dep't of Educ.*, 675 F. Supp. 2d 660 (W.D. Va. 2009) (emphasis in original) (quoting *Williams v. Hansen*, 326 F.3d 569, 574 (4th Cir. 2003)). The SAC alleges no intentional or purposeful discrimination by any individual defendant. SLU mentions that certain men's sports generate revenue, but it expressly disclaims this as a factor in the alleged sex-based discrimination, instead asserting that Defendants have engaged in preferential treatment of men "regardless of whether those men make millions of dollars for UVA through sports or not." SAC ¶ 94. *See* SAC ¶ 44. Because the SAC is devoid of any allegation of intentional or purposeful discrimination on the basis of sex, SLU's Fourteenth Amendment claim should be dismissed.

### 4. The individual defendants are entitled to qualified immunity from SLU's § 1983 personal capacity claims.

Under the doctrine of qualified immunity, government officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense." *Durham v. Jones*, 737 F.3d 291, 299 (4th Cir. 2013) (citations omitted). Because qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation," it is important to resolve this issue "early in the proceedings." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

Qualified immunity generally involves a two-step inquiry: (a) whether the plaintiff's allegations state a claim that the defendant's conduct violated a constitutional right; and if so, (b) whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier*, 533 U.S. at 194, 201). As analyzed above, SLU's allegations falter at the first step of the analysis because they state no claim that any individual defendant engaged in any conduct that violated a constitutional right.

While the Court may stop after the first step, *see* Pearson, 555 U.S. at 236, SLU's claims against the individual defendants also fail at the second step. In conducting the "clearly established" analysis, courts in the Fourth Circuit look to the decisions of the U.S. Supreme Court, the Court of Appeals for the Fourth Circuit, and the Supreme Court of Virginia, and "ordinarily need not look any further than decisions from these courts." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538-39 (4th Cir. 2017) (citations omitted). To determine whether a right is clearly established, it is not required that a case be "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citations omitted). Clearly established rights should not be defined "at a high level of generality," but "must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citations omitted). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 136 S. Ct. at 308 (emphasis in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

The individual defendants' conduct here, as alleged by SLU, violated no clearly established law on SLU's First Amendment rights to free speech or free association. The U.S. Supreme Court's decision in *Martinez* is the applicable and particularized law on a public educational institution's enforcement of a reasonable and viewpoint neutral conduct policy that

incidentally impacts a private organization's ability to speak or associate on school property. A reasonable UVA official or employee, aware of the facts and outcome of *Martinez*, would not be on notice that applying UVA's Hazing Policy and suspending SLU's status as a student organization would violate SLU's First Amendment rights. To the contrary, under the clearly established law of *Martinez*, the individual defendants' alleged actions in suspending SLU as a student organization for violating the Hazing Policy were objectively reasonable, and each of these defendants is entitled to qualified immunity from the SAC's First Amendment claims.

Further, the individual defendants' conduct violated no clearly established law on Fourteenth Amendment sex-based equal protection. The Fourth Circuit case law discussed above instructs that an equal protection violation arises when university employees intentionally discipline female students more harshly than materially identical male students engaging in the same conduct. A reasonable UVA official or employee, aware of this legal framework, would not be on notice that applying the Hazing Policy to SLU would implicate comparisons with dissimilar student groups to which the policy does not apply, such as academics and sports teams, or with unspecified and purported "more serious" hazing conduct by male fraternal organizations. In contrast, it would be objectively reasonable for the individual defendants to treat different students and different conduct in the manner warranted by each unique situation. All defendants are entitled to qualified immunity on the SAC's equal protections claims.

### 5.   The SAC fails to state a claim under § 1985(3).

"Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates. And so, the rights, privileges, and immunities that § 1985(3) vindicates must be . . . rights guaranteed by federal law or the Constitution." *Sines v. Kessler*, 324 F. Supp. 3d 765, 781 (W.D. Va. 2018) (citations omitted). As described above, the SAC fails to state a claim for any violation of the First or Fourteenth Amendments, and SLU

alleges no other violations of federal law or the Constitution. Accordingly, SLU fails to state a claim under § 1985(3) against the individual defendants.

Moreover, SLU's § 1985(3) claim is barred by the doctrine of intracorporate immunity. "The intracorporate immunity doctrine provides that a conspiracy can not exist between the agents of a corporation and the corporation itself." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 544 (4th Cir. 1997) (citations omitted). The Fourth Circuit applies the intracorporate immunity doctrine to conspiracies alleged under § 1985(3). *See Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 352-53 (4th Cir. 2013) (affirming dismissal of § 1985(3) claim on the basis of the individual defendants' intracorporate immunity) (citations omitted). The SAC pleads that the individual defendants are officers or employees of UVA, *see* SAC ¶¶ 6-11, applying a UVA policy to a UVA-recognized student organization. *See* SAC ¶¶ 13, 39-40. Thus, these defendants are agents of UVA entitled to intracorporate immunity from the SAC's § 1985(3) claims.

### 6.    The SAC fails to state a claim under § 1986.

"A cause of action based upon § 1986 is dependent upon the existence of a claim under § 1985." *Sines v. Kessler*, 324 F. Supp. 3d 765, 798 (W.D. Va. 2018) (citations omitted). Because SLU's § 1985(3) claims fail, its § 1986 claims also fail and should be dismissed.

### 7.    The SAC fails to state a claim against UVA under Title IX.

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participating in, be denied benefits of, or be subject to discrimination under any educational program or activity receiving Federal financial assistance." *Streno v. Shenandoah Univ.*, 278 F. Supp. 3d 924, 928 (W.D. Va. 2017) (quoting 20 U.S.C. § 1681). In an attempt to make out a claim under Title IX, SLU alleges "disparate treatment discrimination" against UVA. SAC ¶¶ 93-96. Specifically, SLU alleges that "Defendants' hazing policy is an applied discrimination

23

and violates Title IX because it is [sic] applies only to women but not to men, regardless of whether those men make millions of dollars for UVA through sports or not." SAC ¶ 94.

Disputes over school disciplinary proceedings on the grounds of gender bias generally fall within two categories. *See Streno*, 278 F. Supp. 3d at 929 (citing *Yusuf v. Vasser College*, 35 F.3d 709, 715 (2nd Cir. 1994)); *see also Doe v. Fairfax Cty. Sch. Bd.*, 384 F. Supp. 3d 598, 606-07 (E.D. Va. 2019) (citations omitted); *Sheppard v. Visitors of Va. State Univ.*, No. 3:18-cv-723, 2019 U.S. Dist. LEXIS 70661, at *10 (E.D. Va. April 25, 2019) (citations omitted). Under the "erroneous outcome" theory, a student may claim that a university disciplinary proceeding wrongly found the student responsible for an offense.[7] *Streno*, 278 F. Supp. 3d at 929 (citing *Doe v. Washington & Lee Univ.*, No. 6:14-cv-52, 2015 U.S. Dist. LEXIS 102426, at *25 (W.D. Va. Aug. 5, 2015)). The second theory, "selective enforcement," "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id. (citing Yusuf*, 35 F.3d at 715).

At best, it appears that SLU attempts to allege that UVA is in violation of Title IX under a selective enforcement theory, but the allegations in the SAC fail to state a claim for "selective enforcement. To state a claim for selective enforcement, a student must plausibly allege that, independent of whether the student was guilty or innocent of the disciplinary charge, "the severity of the penalty and/or decision to initiate that proceeding was affected by the student's gender." *Doe v. Fairfax Cty. Sch. Bd.*, 384 F. Supp. 2d 598, 606-07 (E.D. Va. 2019) (quoting *Yusuf*, 35 F.3d at 715). A student must plausibly allege that he or she was "similarly situated" to a student of a different gender that the school "treated more favorably." *Id.* at 608 (citations omitted); *see also Streno*, 278 F. Supp. 3d at 932 (citations omitted). The student must also

---

[7]     The allegations in the Complaint do not fall under this "erroneous outcome" category.

plausibly allege that gender was a motivating factor in the decision. *See Yusuf*, 45 F.3d at 715 (citations omitted); *see also Biggs v. Edgecombe Cty. Pub. Schs. Bd.*, No. 4:16-cv-271, 2018 U.S. Dist. LEXIS 158894, at *13 (E.D. N.C. Sept. 18, 2018) (citations omitted).

SLU claims that UVA found it in violation of the Hazing Policy based on SLU's 25 hour per week study requirement for its new members. *See* SAC ¶ 40. It further claims that UVA made this finding even though studying 25 hours per week is not uncommon at leading universities, *see* SAC ¶ 41, and "despite being aware that other activities (or student associations or student groups) at UVA require 'activity' programming in excess of 25 hours." SAC ¶ 42.

SLU has not, however, identified similarly situated students of a different gender that the school "treated more favorably." Instead, as its male comparator, SLU points to UVA's men's sports programs. *See* SAC ¶¶ 42-46. It claims UVA has not found hazing violations against these men's teams despite "UVA's top-grossing men's sports programs, including men's football and basketball, often requir[ing] time commitments of their students in excess of 25 hours per week." SAC ¶ 44. SLU further lists numerous "activities" student athletes perform as part of their duties to UVA. SAC ¶ 45. And it even notes the 2018-2019 UVA's men's basketball team's trip to the Bahamas over the 2018 Thanksgiving break to play in the "Battle 4 Atlantis" tournament as an incident where "[d]efendants allowed male students to engage (or to be required to engage) in 'activity' for more than 23 per week ***to play sports*** (and not study at all) without accusing the basketball program of hazing or suspending any of its male players or suspending the activities of the basketball team." SAC ¶ 46 (emphasis in original).

UVA sanctioned SLU under its Hazing Policy. This policy only governs the conduct of *students* who are "members of a student organization," and their interactions with *other student members or prospective members* of the student organization. *See* Ex. A at 1. The conduct of the

25

men's sports teams described in the SAC—NCAA rules and other hourly requirements for student athletes to participate in athletic or academic activities per week, *see* SAC ¶¶ 43, 45—does not implicate the Hazing Policy. These allegations do not involve any "action taken or situation created by a member or members of a student organization toward one or more organization members or prospective members in connection with initiation, admission, affiliation, or ongoing membership in the organization."[8] *See* Ex. A at 1.

Similarly, any reference to the rigors of the academic programs and coursework at UVA has no bearing on SLU's claim of disparate treatment. *See* SAC ¶ 47 ("[O]n information and belief, Defendants made their hazing finding about SLU despite being personally and institutionally aware that certain courses and academic programs offered at UVA require more than 25 hours per week to complete the courses and academic programs satisfactorily.") The Hazing Policy does not govern academic coursework or the time students spend studying outside of the classroom.

"For their circumstances to be considered 'sufficiently similar,' two individuals must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the school's treatment of them for it." *Doe v. Fairfax Cty. Sch. Bd.*, No. 1:19-cv-65, 2019 U.S. Dist. LEXIS 170577, at *11 (E.D. Va. Sept. 11, 2019) (citations omitted). SLU's identified male comparators simply were not engaged in the same conduct.

---

[8]     In the SAC, SLU has added allegations concerning the UVA football team that were not in the original or First Amended Complaint. SAC ¶¶ 54-58. SLU notes the "significant physical, mental, and emotional pain" routinely suffered by students participating in UVA's football program and that despite these harms suffered, "on information and belief Defendant UVA has never made a hazing finding against its profit-generating sports programs." SAC ¶¶ 55, 58. Again, these allegations do not implicate UVA's Hazing Policy because they do not involve the actions of members of a student organization toward other student members or prospective members in connection with initiation, admission, affiliation, or ongoing membership in the organization. SLU has simply described the perils associated with playing football.

Finally, SLU's vague allegations concerning other male organizations are insufficient to survive a Rule 12(b)(6) challenge. SLU claims discrimination because it was sanctioned "for no actual misconduct whatsoever, whereas male students have not and do not receive such sanctions for engaging in 'activities' that have comparable if not greater hourly requirements." SAC ¶ 66. It does not, however, allege what these other activities are and in no way indicates that they are comprised of 25 or more hours per week of required study time. SLU further claims defendants have "allowed non-female fraternal organizations to continue operating even when more serious (i.e. actual) hazing incidents occurred." SAC ¶ 68. No such hazing incidents, however, are identified in the SAC.

SLU fails to allege any facts to support a claim that the "gender [of its members] was a motivating factor" in UVA's decision to find SLU in violation of the Hazing Policy. Instead, SLU simply asserts that it is a female organization, and "on information and belief," UVA treated male organizations differently, and thus discrimination has occurred. Such conclusory allegations are insufficient under Rule 12(b)(6) to state a Title IX claim against UVA.

## V.   CONCLUSION

For the foregoing reasons, the Court should grant the Motion to Dismiss, dismiss SLU's claims against Defendants with prejudice, dismiss Defendants from further proceedings in this action, and grant any other relief that the Court deems just and proper.

Respectfully submitted,

RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA, FRANK M. CONNER III, PATRICIA M. LAMPKIN, J. MARSHALL PATTIE, EDGAR HALCOTT TURNER II, and CAROLINE WAGNER

By: _____/s/ Sheri H. Kelly_____
                    Counsel

27

Sheri H. Kelly (VSB No. 82219)
Assistant Attorney General
Office of the Attorney General
204 Abingdon Place
Abingdon, Virginia 24211
(276) 628-2964 Telephone
(276) 628-4375 Facsimile
skelly@oag.state.va.us

Sandra S. Gregor (VSB No. 47421)
Assistant Attorney General
Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
(804) 786-1586 Telephone
(804) 371-2087 Facsimile
sgregor@oag.state.va.us

Barry T. Meek, Esq. (VSB No. 41715)
Associate University Counsel and Senior Assistant Attorney General
University of Virginia
Office of University Counsel
Madison Hall
1827 University Avenue
Charlottesville, Virginia 22903
(434) 924-3586 Telephone
(434) 982-3070 Facsimile
bmeek@virginia.edu

*Counsel for Defendants Rector and Visitors of the University of Virginia, Frank M. Conner III, Patricia M. Lampkin, J. Marshall Pattie, Edgar Halcott Turner II, and Caroline Wagner*

## <u>CERTIFICATE</u>

I hereby certify that on the 6th day of January, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record for the plaintiff.

By: _____/s/ Sheri H. Kelly_____
                 Sheri H. Kelly